SUBSTITUTE OPINION
THE ORIGINAL OPINION ISSUED ON THIS DATE IS HEREBY WITHDRAWN.
BURDICK, Chief Justice.
This is an appeal from a judgment dismissing an action wherein the plaintiff sought damages for injuries sustained as a result of contracting certain infections. The district court employed a differential diagnosis analysis and held that plaintiffs medical experts were required to rule out possible sources of the infections, other than the defendant’s care. The district court determined that plaintiffs medical experts’ opinions were inadmissible because they did not address the other possible sources of the infections that were suggested by defendant’s medical expert. We vacate the judgment and remand for further proceedings.
I. FACTUAL BACKGROUND
This action was filed by Judy Nield to recover damages from Pocatello Health Services, Inc., d/b/a Pocatello Care and Rehabilitation Center (PCRC), due to its alleged negligence in providing her with wound care, which allegedly caused her to become infected with methieillin-resistant staphylococcus aureus (MRSA) and pseudomonas aeruginosa (pseudomonas), ultimately necessitating the *805 amputation of her lower left leg and surgery to repair her right hip implant.
On August 21, 2007, sixty-five-year-old Nield was taken to the emergency room at Portneuf Medical Center (PMC) for pain and swelling in her left leg and pain in her right hip. She had had a bilateral hip replacement in 1994, and since then she had a lack of feeling in her left leg below the knee. In 2005, she dislocated her left hip in a fall, but it went undiagnosed and she continued ambulating by using a cane or walker. In April 2007, her pain increased to the point that she began using a wheelchair. She developed open sores on her lower left leg, and a nurse visited her home to assist with dressing changes. By August 21, Nield’s pain was so severe that she could not get out of bed, resulting in her trip to the emergency room. It was noted that she presented “with worsening oozing and redness of her left lower extremity.” Upon admission, she was “placed on contact isolation in ease she had MRSA.” She was administered intravenous antibiotics and wound and blood samples were collected. A laboratory report of a sample collected on August 21, 2007, from “WOUND, LEFT LEG” did not reveal either MRSA or pseudomonas.
On August 23, 2007, a physician was consulted regarding Nield’s cellulitis and right hip pain. He noted that “[s]he has a fair amount of cellulitis and open blistering of her left lower extremity” and “[s]he has much less cellulitis and open areas on the right leg but has fair amount of pain both laterally and anteriorly with range of motion of her hip.” The physician ordered an aspiration of her right hip to check for infection, but noted: “Unfortunately the results of this aspiration are going to be compromised because of starting the antibiotics. However, if we obtain a considerable amount of white blood cells we can assume that the hip is infected.” An aspiration of her right hip was done on August 23, 2007. The laboratory report stated that no organisms were seen after 48 hours. Nield was discharged from the hospital on August 25, and the discharge summary stated that “an aspiration of the right hip showed only white blood cells but did not grow any bacteria.” The discharge summary ends with a handwritten note by Dr. Ryan Zimmerman — “MRSA screen negative.”
That same day, Nield was admitted to PCRC for the purpose of healing the sores on her left leg so that she could undergo surgery to repair her hip implants. She had four open wounds on her lower left leg that were to be treated. The wounds were on her left ankle, her left shin, the top of her left foot, and the back of her left calf. Upon her admission, she was not screened for either MRSA or pseudomonas.
A laboratory report of a sample collected on November 9, 2007, from “WOUND, LEFT LEG” revealed both moderate MRSA and moderate pseudomonas. She was placed on intravenous antibiotics and completed that treatment on November 25, 2007. A laboratory report of a sample collected on November 27, 2007, from “WOUND, LEFT LEG” revealed light MRSA and did not reveal pseudomonas. She was then placed on another antibiotic. On December 3, 2007, she left PCRC because her Medicare coverage was expiring.
Nield returned home where she remained until March 20, 2008, when she was admitted to PMC because of a MRSA infection in her left foot that had spread to her ankle bone. She was transferred to a hospital in Utah. On April 2, 2008, Nield’s left leg was amputated below the knee due to the infection.
Nield filed suit against PCRC on October 1, 2009, claiming that negligent wound care and unsanitary conditions at its facility violated its duty of care, resulting in the amputation of her leg, impairment of her mobility, and attendant physical pain and suffering. On October 8, 2010, PCRC moved for summary judgment on the ground that Nield could not prove that the MRSA and pseudomonas infections she contracted were caused by its negligence. PCRC supported this motion with the affidavit of Dr. Thomas Coffman, a physician who was board certified in both internal medicine and infectious disease.
Among other things, Dr. Coffman stated:
(a) MRSA is not more virulent than other strains of staphylococcus.
*806 (b) A person may be colonized with MRSA but not show signs or symptoms of infection.
(c) MRSA can be found in health care facilities and outside of health care facilities. MRSA is ubiquitous within skilled nursing facilities and long term facilities.
(d) MRSA can be transmitted in many ways, including contact with someone who has an active infection, contact with someone who is MRSA colonized but not infected, contact with an object that has been contaminated with MRSA, or breathing in droplets expelled by a MRSA carrier or infected person expelled during breathing, coughing or sneezing.
(e) A resident at a skilled nursing facility such as [PCRC] can become MRSA colonized or infected despite strict adherence to an appropriate infection control policy:
(f) Wound and fluid cultures are one way to determine if a person is infected with MRSA or pseudomonas.
(g) People may also be screened for MRSA to identify individuals who are MRSA colonized____ I have not seen any records of MRSA screening for Ms. Nield prior to her admission to [PCRC], I note that the August 25, 2007 discharge summary from [PMC] includes a handwritten note that a MRSA screen was negative____However, there are no records of any MRSA screen____Based upon the records, it appears Dr. Zimmerman’s reference to a negative MRSA screen is referring to the culture taken of Ms. Nield’s wound on August 21, 2007, and not an actual MRSA screening. Based on the lack of any MRSA screen report, it is fair to assume that a MRSA screen was not performed. If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to Pocatello Care and Rehab on August 25, 2007.
(h) Like MRSA, people may be carriers of pseudomonas aeruginosa without showing any signs or symptoms of infection.
(i) Based on the records available, it is not possible to determine with a reasonable degree of medical certainty, whether or not Ms. Nield was MRSA or pseudomonas colonized as of the date she was admitted to [PCRC].
(j) The August 21, 2007 wound culture does not rule out the possibility Ms. Nield was colonized or infected with MRSA or pseudomonas____It is possible Ms. Nield had MRSA and/or pseudomonas in her swabbed leg wound, but that the culture did not grow out and identify these bacteria, resulting in a false negative.
(k) Based upon the records available, my knowledge experience and training, it is not possible to determine whether or not Ms. Nield was MRSA or pseudomonas colonized as of the time she was admitted to [PCRC] on August 25, 2007. As such, it is not possible to determine when, where or how Ms. Nield became infected with MRSA or pseudomonas.
Dr. Coffman offered no opinion as to whether the amputation of Nield’s leg was necessitated by MRSA or pseudomonas infections.
Nield moved to strike portions of Dr. Coffman’s affidavit on a number of grounds, particularly asserting that critical opinions were based on speculation. In her memorandum submitted in support of the motion to strike, Nield stated:
Dr. Coffman again asserts supposition in concluding ... “it appears” that Dr. Zimmerman’s reference in his discharge summary ... to a negative MRSA screen refers to the culture taken, “and not an actual MRSA screening based on the lack of any MRSA screen report.” Dr. Coffman goes on to speculate, “it is fair to assume that a MRSA screen was not performed.” Again, Dr. Coflman speculates, and does not endeavor to produce any facts to ascertain whether a screen and culture were done.
Dr. Coffman goes on to conclude: “If Ms. Nield was not screened for MRSA, it is not *807 possible to determine if she was MRSA colonized at the time she was admitted to [PCRC] on August 25, 2007.” This is again supposition and conclusory speculation. Dr. Coffman’s speculation is evident by his use of “If’ indicative of his eonclusory speculations.
Nield also responded to PCRC’s summary judgment motion with the affidavits of three experts: Sidney Gerber, a nursing facility expert; Suzanne Frederick, a nursing care expert; and Dr. Hugh Selznick, a medical expert. Each of Nield’s experts attributed her infections to poor infection control measures by the staff of PCRC.
Gerber submitted an affidavit, which attached and incorporated a more comprehensive report. In his report, he stated that nursing home operators must:
Establish and maintain an infection control program designed to provide a system that monitors, investigates, controls, and prevents the development and spread of disease and infection in the facility, and for a resident to live in a safe, sanitary, and comfortable environment.
Based on his review of PCRC records, as well as survey findings by the Idaho Department of Health & Welfare (IDHW) regarding complaints against PCRC, Gerber opined that PCRC did not comply with applicable safety and hygienic standards. Among other things, he stated:
According to the [IDHW] survey conducted on January 24, 2008, [PCRC] failed to implement its own policies and procedures regarding proper wound care technique according to accepted standards of practice to prevent the spread of infection. Repeatedly, surveyors observed nurses failing to use proper wound care, i.e. using basic universal precautions of washing or sanitizing their hands while providing treatment to two facility residents, one of which was admitted to the facility with MRSA (Methicillin-resistant Staphylococcus aureus)____ Although Ms. Nield was not one of the residents surveyed, she was discharged home on 12/3/07 with MRSA____
Frederick, the nursing care expert, submitted both an affidavit and a more comprehensive report. The report does not appear in the record as an attachment to her affidavit but, rather, as an attachment to the affidavit of Nield’s counsel. The report cited to PCRC’s “substandard nursing practices regarding infection control,” based upon her review of PCRC’s records and the IDHW survey. She recites:
During the inspections, surveyors observed nurses during wound care that failed to follow professional practice standards and facility policies and procedure to prevent infections. The facility was cited for failing to ensure residents received proper wound care according to accepted standard of practice in order to prevent the possible spread of infection. According to the survey documents, nurses repeatedly failed to wash their hands at appropriate times during the wound care procedures and failed to follow proper precautions, including with a resident that had MRSA____The surveyor’s description of the nursing staffs actions and breaches of the standard of care demonstrated the facility’s failure to adequately train and supervise the nursing staff in order to prevent the spread of infection such as MRSA. The nurse’s failure to wash hands and failure to remove soiled and contaminated gloves prior to touching items and equipment showed that the nurse did not understand basic infection control principles____The nursing staff failed to properly communicate the condition of Mrs. Nield’s wounds to her physician and the healthcare team. The nurses failed to document Mrs. Nield’s wounds completely and accurately____The written record is an extremely important part of communication and the failure to maintain a complete and accurate record prevents the healthcare team from properly evaluating a resident’s needs and response to treatment.
Dr. Selznick submitted an affidavit, which attached and incorporated a more lengthy report, dated September 11, 2009. Among other things, he stated in the report:
(a) MRSA is not a community acquired staph but rather a bacteria often acquired nosocomially or as a result of hospitalization. Methicillin resistant staph is a rather virulent microbe re *808 sistant to many antibiotics, including penicillin-related methieillin. The initial staph present, per 08/21/07 wound cultures (coagulase negative) was a much less virulent and more susceptible organism.
(b) There is no evidence, in my opinion, to a reasonable degree of medical certainty, that Ms. Nield had MRSA infection prior to entering [PCRC]. Objective evidence for same exists, based on her 08/21/07 left lower extremity wound cultures which confirmed coagulase negative staph, not MRSA, whereas subsequent cultures following her hospitalization at [PCRC] did grow out MRSA (11/09/07, 01/18/08, 03/13/08).
(c) The provided medical records confirmed initiation of wound care at the Portneuf Wound Care & Hyperbaric clinic on 11/09/07 with treatment notes in evidence through 03/20/08. No wound cultures were done at [PCRC] from 08/25/07 until a wound culture was performed at Portneuf Wound Care & Hyperbaric Clinic on 11/09/07 initial evaluation. This wound culture grew coagulase positive staph, which was different from the prior coagulase negative staph. Sensitivity patterns confirmed this was a methieillin resistant Staphglococcus aureus. Additionally, the 11/09/07 wound culture grew moderate Pseudomonas aeruginosa.
(d) My detailed review of the [IDHW] Summary Statement of Deficiencies, ... confirmed a patient being treated in August of 2007 at the [PCRC] for wound care and “pseudomonas cellulitis of both knees.” It is my opinion the objectively confirmed pseudomonas infection of left lower extremity wounds per 11/09/07 culture was indeed contracted at [PCRC]. In addition, allegations outlined in a 02/19/08 letter to the administrator of [PCRC] ... confirmed, “There were four or five other residents in rooms near the identified resident with methieillin resistant staphylococcus aureus infections.” The findings of the investigation confirmed and substantiated poor infection control measures by the staff.
(e)It is highly unlikely, in my opinion, that Ms. Nield contracted pseudomonas from any other source other than from her [PCRC] hospitalization given aforementioned positive 11/09/07 culture results. This is a very rare organism to cause total joint infection in general, and given the positive 11/09/07 wound culture for pseudomonas, it is more likely than not, colonization occurred while hospitalized at [PCRC] and ultimately led to her right hip demise. It should be noted that right hip aspiration at the time of her 08/21/07 admission was negative.
Prior to the hearing on its summary judgment motion, PCRC moved to strike portions of Nield’s affidavits. With regard to Dr. Selznick’s affidavit, PCRC sought to strike as speculative and/or without foundation one full paragraph, one sentence in another paragraph, and two sentences in a third paragraph. In addition, a statement contained in a fourth paragraph was sought to be stricken on the grounds of being conclusory. PCRC did not seek to strike any portion of two medical reports Dr. Selznick had attached and incorporated into his affidavit, consisting of approximately fifty-two pages and containing further medical opinions. PCRC sought to strike the entirety of Frederick’s affidavit as being speculative and without foundation and one paragraph of Gerber’s affidavit on grounds of speculation and lack of foundation. PCRC did not seek to strike the eight-page report that Gerber attached and incorporated into his affidavit, detailing standards applicable to nursing care facilities for controlling and preventing the spread of infectious diseases, including MRSA, and explaining how PCRC had failed to comply with those standards. PCRC did not seek to strike any portion of Fredrick’s report either, which was submitted as an incorporated attachment to the affidavit of Nield’s counsel.
The district court, rather than dealing directly with the evidentiary deficiencies asserted by PCRC, determined that Dr. Selznick’s entire affidavit was inadmissible under I.R.E. 702 because it did “not con *809 tain the reasoning or methodology required to assist the trier of fact in determining whether [PCRC’s] actions were a substantial factor in [Nield] contracting MRSA and pseudomonas.” The court noted, however, that it did “not mean to suggest that Dr. Selzniek does not possess the knowledge, skills or qualifications to address the question of causation.” Although the district court mentioned the affidavits of Frederick and Gerber in its memorandum granting summary judgment, it did not analyze either of the affidavits or rule on their admissibility. However, in its memorandum ruling on Nield’s motion for reconsideration, the district court erroneously stated it had conducted an analysis of those affidavits and “found [them] to be similarly insufficient in establishing where and how [Nield] contracted MRSA and pseudomonas.” The district court made no mention of the reports prepared by Frederick and Gerber.
The district court quoted I.R.E. 702, noting that expert testimony will not be of assistance to the trier of fact and is inadmissible if it is speculative, conclusory or unsubstantiated by facts in the record. On the other hand, the court noted that if an expert’s reasoning and methodology are scientifically sound and based on a reasonable degree of medical probability, the testimony will be of assistance to the trier of fact and admissible.
Because Dr. Selzniek’s and Dr. Coffman’s opinions differed as to when and where Nield had likely contracted MRSA, the district court concluded that it was dealing with a “differential diagnosis” case, citing Weeks v. Eastern Idaho Health Services:
Differential diagnosis involved an analysis of all hypotheses that might explain the patient’s symptoms or mortality. After identifying all of the potential causes of symptoms, the expert then engages in a process of eliminating hypotheses in order to reach a conclusion as to the most likely cause. When using differential diagnosis a district court is justified in excluding the expert’s testimony if the expert fails to offer an explanation why an alternative cause is ruled out.
143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007) (citing Clausen v. M/V New Carissa, 339 F.3d 1049, 1057-58 (2003)).
Based on its determination that a differential diagnosis analysis was appropriate, the district court determined that Dr. Selzniek’s affidavit was inadmissible because it did not negate possible alternate sources through which Dr. Coffman suggested Nield may have contracted MRSA — the possibility that Nield may have been a carrier of MRSA, the possibility that the culture of her left leg wound may have produced a false negative, or “the other factors that could have been a substantial factor in causing the infections.” It was apparently the district court’s view that Nield’s affidavits, particularly that of Dr. Selzniek, were required to negate the possible sources of infection suggested by Dr. Coffman in order to be admissible under I.R.E. 702. Based on its holding that Dr. Selzniek’s affidavit was inadmissible, the district court stated, “there is no need for this Court to address the Motions to Strike filed by the Plaintiff.” The district court apparently accepted Dr. Coffman’s affidavit testimony despite Nield’s objections and utilized that testimony in determining the admissibility of Dr. Selzniek’s testimony.
Having stricken Dr. Selznick’s affidavit and assuming it had stricken the other two affidavits, the district court concluded that Nield had presented no admissible evidence to counter the statements in Dr. Coffman’s affidavit and, therefore, granted summary judgment in favor of PCRC. A judgment dismissing the case was thereafter entered and it is from that judgment that Nield timely appealed.
II. ISSUES ON APPEAL
1. Whether the district court erred in using a differential diagnosis analysis to determine the admissibility of Dr. Selznick’s affidavit.
2. Whether the district court erred in relying upon Dr. Coffman’s affidavit.
3. Whether the district court erred in using Dr. Coffman’s affidavit as a yardstick for determining the admissibility of Nield’s affidavits.
*810 III. STANDARD OF REVIEW
The summary judgment in this case was premised on the district court’s determination that Nield had submitted no admissible evidence in opposition to PCRC’s summary judgment motion. Thus, we are presented with an evidentiary issue. In this regard, we recently stated:
The admissibility of evidence contained in affidavits and depositions in support of or in opposition to a motion for summary judgment is a threshold matter to be addressed by the court before applying the liberal construction and reasonable inferences rule to determine whether the evidence creates a genuine issue of material fact for trial. This Court applies an abuse of discretion standard when reviewing a trial court’s determination of the admissibility of testimony offered in connection with a motion for summary judgment. A trial court does not abuse its discretion if it (1) correctly perceives the issue as discretionary, (2) acts within the bounds of discretion and applies the correct legal standards, and (3) reaches the decision through an exercise of reason.
Gerdon v. Rydalch, 153 Idaho 237, 241, 280 P.3d 740, 744 (2012) (internal quotation marks and citations omitted).
IV. ANALYSIS
A. The district court erred in using a differential diagnosis analysis to determine the admissibility of Dr. Selznick’s affidavit.
The distinct court concluded that it was dealing with a differential diagnosis case involving several potential causes of Nield’s symptoms, citing the Weeks case. Nield contends that the court erred in doing so and requiring that she “eliminate any other causes and show that she could have only gotten MRSA and pseudomonas from PCRC.” On the other hand, PCRC asserts that, based on Dr. Coffman’s affidavit, there are multiple possible sources of infection and Nield was required in her affidavits to eliminate all possible sources but PCRC.
Differential diagnosis is merely an alternate means of establishing causation where there are several potential causes of symptoms and there is insufficient scientific basis to conclusively establish any one potential cause. Weeks, 143 Idaho at 839, 153 P.3d at 1185. In Weeks, the plaintiffs medical expert was unable to determine to a “reasonable medical probability” the exact effect of certain medications upon a patient’s brain. Id. The brain injury, which resulted in the patient’s death, could have been as a result of the “chemicals themselves, the volume of fluid, or the combination of the two.” Id. The expert had no scientific studies upon which to opine as to the effect of the chemicals on the patient’s brain. Id. However, there was scientifically reliable evidence regarding the deleterious mechanical effect on the patient’s brain of increasing the intracranial pressure. Id. Thus, this Court held that the district court erred in failing to admit the expert’s testimony into evidence even though he could not pinpoint the exact cause of the injury. Id. at 840, 153 P.3d at 1186. Where a specific cause of a patient’s symptoms can be stated to a reasonable medical certainty, there is no place for this alternate means of establishing causation.
This Court has not had occasion to flesh out the parameters of the differential diagnosis methodology. Because of the misconceptions apparent in the district court’s decision, we take this opportunity to do so. While we have not previously defined “diagnosis” in this context, we find the Black’s Law Dictionary definition to be appropriate: “The determination of a medical condition (such as a disease) by physical examination or by study of its symptoms.” Black’s Law Dictionary 464 (7th ed.1999). Some federal courts have employed a more expansive definition that incorporates “differential etiology,” which is “a term used on occasion by expert witnesses or courts to describe the investigation and reasoning that leads to the determination of external causation, sometimes more specifically described by the witness or court as a process of identifying external causes by a process of elimination.” McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1252 (11th Cir.2005). Being the highest court of a sovereign state, we are free to adopt our own concept of differential diagno *811 sis and we decline to follow the more expansive definition employed by some federal courts. In this case, only one cause of symptoms was considered by the district court— the hypothesis that MRSA and pseudomonas were the cause of Nield’s injuries. Dr. Selznick flatly stated that they were the cause of her injuries, while Dr. Coffman did not directly address the issue in his affidavit. The main issues in dispute were when, where, and how Nield may have contracted the infections. Dr. Selznick opined that she could only have contracted the infections at PCRC. Dr. Coffman opined that she could have contracted the infections elsewhere and that it was impossible to determine exactly where that might have been. This dispute, however, is not one that is appropriate for resolution under a differential diagnosis analysis.
Differential diagnosis can be utilized at the evidentiary stage of a case to determine whether an expert’s opinion constitutes admissible evidence. It may also be employed at the summary judgment and trial stages. In those latter stages, the expert presenting differential diagnosis evidence must do so in an adversarial setting. However, the admissibility stage is not subject to an adversarial process, such as the district court employed here. In other words, in determining whether an expert’s testimony is admissible, “[t]he Court must look at the affidavit or deposition testimony and determine whether it alleges facts, which if taken as true, would render the testimony admissible.” Edmunds v. Kraner, 142 Idaho 867, 871, 136 P.3d 338, 342 (2006). Indeed, that is what the Court did in Weeks. The plaintiffs expert in Weeks was unable to present a diagnosis stating the cause of symptoms to a reasonable medical probability, but avoided summary judgment by employing the differential diagnosis methodology. 143 Idaho at 839, 153 P.3d at 1185. The expert testimony in Weeks was judged, not by material contained in an opposing affidavit, but by material contained in the expert’s own affidavit testimony.
Here, Dr. Selznick testified to a reasonable degree of medical certainty that Nield contracted her infections at PCRC, rather than before she was admitted there. The district court should have focused on what Dr. Selznick said in his affidavit and incorporated reports, rather than what he did not say or what Dr. Coffman said. If Dr. Selznick’s opinion testimony was insufficient, that is a matter for determination in the adversarial summary judgment stage of the proceeding. The district court did not rule that Dr. Selznick was unqualified to address the issue of causation or that he lacked an adequate foundation, but rather, the court based its determination solely on the ground that he did not counter the various possibilities suggested by an opposing expert. When this Court stated in Weeks that a district court is justified in excluding expert testimony if the expert fails to offer an explanation as to why an alternate cause is ruled out, we were not considering the situation where an opposing expert was questioning the testimony of the plaintiffs expert. Rather, we were addressing the situation where the plaintiffs expert could not state an exact cause to a degree of medical probability, raised two possible causes, stated that one was more probable than the other but then observed that both likely played a part. The analysis in Weeks was confined to the matters stated in the expert’s affidavit, not upon some external testimony.
Dr. Selznick opined that MRSA is an infectious disease, that it is spread by some sort of contact, that Nield did not have MRSA or pseudomonas prior to admission to PCRC, and that she contracted the infections at PCRC as a result of its unsanitary conditions and improper wound care. Since we do know Nield’s diagnosis, as presented to the district court on PCRC’s summary judgment motion — infection with MRSA and pseudomonas[1] — there was no need to go further to *812 “explain the patient’s symptoms or mortality,” nor was there any requirement to rule out alternate causes of those symptoms.
The district court had the mistaken conception, apparently derived from PCRC’s summary judgment memorandum, that expert medical testimony was necessary “in order to establish how and where the plaintiff was infected with MRSA and pseudomonas.” Expert testimony certainly can be of assistance to the trier of fact in establishing that a disease is infectious and how it might be spread or contracted. However, expert testimony is not necessary in determining how a particular person contracted the disease. That is largely a factual matter. Here, both Dr. Selznick and Dr. Coffman submitted testimony that MRSA and pseudomonas are infectious and can be spread from person to person. Dr. Selznick offered testimony as to potential sources of contracting the infection, as well as the probable source for Nield’s infection. Dr. Coffman offered testimony of a variety of sources through which a person might contract an infection. All of this is within the domain of expert testimony. A layperson would not necessarily know where or how a person might contract an infectious disease.
Once the experts have opined as to the potential sources of an infection, it does not take expert testimony to establish exactly how a particular person contracted a particular infection. Fact witnesses can provide the necessary details about sanitary conditions, contact by or with the infected person, wound care received by the infected person, and the like in order to fill in the details. In this ease, as set forth below, some of those details were before the district court in the testimony of Nield, Dr. Selznick, Gerber and Frederick.
PCRC contends, and the court below found, that direct expert testimony is required to show proximate cause. However, this Court held to the contrary in Sheridan v. St. Luke’s Regional Medical Center, 135 Idaho 775, 25 P.3d 88 (2001), a medical malpractice case. In relevant part, the Sheridan Court stated:
Unlike the elements of duty and breach of duty, there is no statutory requirement explicitly stating proximate cause in medical malpractice cases must be shown by direct expert testimony. Therefore, testimony admissible to show proximate cause in a medical malpractice case, like any other case, is governed by the rules of evidence regarding opinion testimony by lay witnesses and experts under Idaho Rules of Evidence 701 and 702.
Furthermore, according to our precedent, proximate cause can be shown from a “chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable.” See Formont [v. Kircher], 91 Idaho [290], 296, 420 P.2d [661], 667 [(1966)].
Id. at 785, 25 P.3d at 98. The Court’s citation to Formont is of particular interest. In that ease, the plaintiff had an infection in his leg that went untreated, eventually resulting in the leg’s amputation. The district court found that the plaintiffs physician had breached the requisite standard of care and that proper care could have been expected to produce different Results, but that there was not enough proof of proximate cause. Formont, 91 Idaho at 295-96, 420 P.2d at 666-67. The question on appeal was whether the trial court erred in finding that the plaintiff failed to establish that the defendant-physician’s care or lack of care was the proximate cause of the loss of plaintiffs leg. Id. at 296, 420 P.2d at 667. The Formont Court reversed the district court stating the following rule in support of its decision:
Respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. [...] If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.
*813 Id. (internal quotation marks and citations omitted). Thus, the district court erred here in holding that expert medical testimony was required in order to establish how and where Nield was infected. This Court’s concept of the differential diagnosis methodology does not require such a holding.
Based on its misconception that this was a differential diagnosis case, the district court concluded that Dr. Selznick’s affidavit was inadmissible. According to the court:
There is nothing in Selznick’s affidavit that addresses the belief that because of the ubiquitous nature of MRSA and pseudomonas the Plaintiff may have been a carrier of MRSA and pseudomonas but was not infected at the time of her admission. Selznick does not explain why the culture of the leg wound would not have produced a false negative and why Plaintiff could only have contracted MRSA and pseudomonas while admitted at PCRC.
In evaluating Selzniek’s affidavit and viewing it in the most favorable light to the Plaintiff, the Court must conclude that the validity of Dr. Selzniek’s reasoning and methodology regarding how the Plaintiff contracted MRSA and pseudomonas is without merit. Selzniek makes a conclusion that because the Plaintiff was negative for MRSA and pseudomonas at the time of her admission to PCRC, but then tested positive for MRSA and pseudomonas prior to her discharge, then she must have contracted MRSA and pseudomonas while at PCRC. He does not address the other factors that could have been a substantial factor in causing the infections. His conclusions are speculative, conclusory, and unsubstantiated in light of the numerous ways the Plaintiff may have contracted these infections. Dr. Selzniek failed to identify all of the potential causes of symptoms, eliminating hypotheses in order to reach a conclusion as to the most likely cause.
The district court erred in determining that Dr. Selznick’s affidavit was inadmissible because it did not eliminate every potential alternate source of Nield’s infections.
B. The district court erred in relying upon Dr. Coffman’s affidavit.
It is clear that the district court relied upon statements contained in Dr. Coffman’s affidavit in making the determination that Dr. Selzniek’s affidavit was inadequate. Dr. Coffman stated that there were a number of ways a person could become colonized or infected by MRSA and pseudomonas. In ruling on the admissibility of Dr. Selzniek’s affidavit, the district court utilized some of Dr. Coffman’s statements that Nield could have been a carrier of MRSA and pseudomonas, that the 8/21/07 leg wound culture could have produced a false negative and that it was “very possible MRSA and/or pseudomonas were present in the wound that was cultured on August 21, 2007.” These three opinions were all based upon Dr. Coffman’s supposition that no MRSA screen was performed prior to Nield’s admission to PCRC on August 25,2007. He states that without a screen for MRSA it is not possible to determine if she was MRSA colonized at the time of admission.
Nield filed a motion to strike these statements, contending that they were speculative. She requested that the district court either strike or disregard them. The district court makes mention of the motion to strike the affidavit of Dr. Coffman in the preface of its summary judgment decision, but the decision contains no analysis whatsoever regarding the objections raised to admission of any of his testimony. Indeed, the district court stated that it need not address the motion to strike, having granted summary judgment to PCRC. In its subsequent decision denying reconsideration, the district court states it “correctly determined that the Defendant’s expert, Dr. Coffman, presented admissible, credible testimony establishing that the Plaintiff could not demonstrate to a reasonable degree of medical certainty when, where, or how she contracted MRSA or pseudomonas.” However, the record contains no support for the district court’s assertion that it had ruled on the admissibility of Dr. Coffman’s affidavit testimony.[2]
*814 It is axiomatic that objeeted-to evidence may not be admitted before the objection is considered and determined. As this Court has frequently held:
Evidence presented in support of or in opposition to a motion for summary judgment must be admissible. Hecla Min. Co. v. Star-Morning Min. Co., 122 Idaho 778, 785, 839 P.2d 1192, 1199 (1992). This threshold question of admissibility of evidence must be decided “before proceeding to the ultimate issue, whether summary judgment is appropriate.” Ryan v. Beisner, 123 Idaho 42, 45, 844 P.2d 24, 27 (Ct.App.1992).
Bromley v. Garey, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (1999). Or, as stated in Ryan v. Beisner:
[I]f the admissibility of evidence presented in support of or in opposition to a motion for summary judgment is raised by the court on its own motion or on objection by one of the parties, the court must first make a threshold determination as to the admissibility of the evidence before proceeding to the ultimate issue, whether summary judgment is appropriate.
123 Idaho at 45, 844 P.2d at 27. The district court erred in failing to rule upon Nield’s objections to statements contained in Dr. Coffman’s affidavit before relying upon those statements to decide the admissibility of Nield’s affidavits. “A trial court’s failure to determine the admissibility of evidence offered in connection with a motion for summary judgment is error that may not be remedied on appeal.” Montgomery v. Montgomery, 147 Idaho 1, 6, 205 P.3d 650, 655 (2009).
Even assuming that the district court had done what it said it did in the decision on reconsideration — actually ruled upon the admissibility of Dr. Coffman’s affidavit before striking Dr. Selznick’s affidavit and deciding the motion for summary judgment — Dr. Coffman’s opinions that depend upon the failure to conduct an MRSA screen are speculative and inadmissible. “Expert opinion which is speculative ... is inadmissible as evidence.” Weeks, 143 Idaho at 838, 153 P.3d at 1184. Although Nield did not specifically raise on appeal the district court’s failure to act upon the motion to strike portions of Dr. Coffman’s affidavit, she submitted substantial argument in her opening brief on appeal that Dr. Coffman’s testimony was speculative and should have been disregarded. This was the same basis upon which she based her motion to strike. Thus, we will consider the issue.
As noted above, Dr. Coffman based the above-mentioned opinions upon his conclusion no MRSA screen had been performed prior to Nield’s admission to PCRC on August 25, 2007. Dr. Coffman states in his affidavit that, “[b]ased upon the records available, it is not possible to determine with a reasonable degree of medical certainty, whether or not Ms. Nield was MRSA or pseudomonas colonized as of the date she was admitted to [PCRC].” (emphasis added). Among the records actually reviewed by Dr. Coffman was a handwritten note on the August 25, 2007 discharge summary saying “MRSA screen negative.” Although Dr. Coffman stated that it was not common practice as of that time to screen incoming patients for MRSA, it appears from his affidavit that this would have been an effective means to determine whether Nield was MRSA colonized at the time. He states: “If Ms. Nield was not screened for MRSA, it is not possible to determine if she was MRSA colonized at the time she was admitted to the [PCRC] on August 25, 2007.” The opposite would appear to be true. His opinion that she was not screened is based on his speculation that the discharge summary note did not mean what it said — “MRSA screen negative.” He concluded that the note was wrong because he did not find a report of the screen in the records he received for review. He says it is “fair to assume that a MRSA screen was not performed,” merely because he did not find one. This is pure speculation. Thus, his contentions that Nield was not MRSA colonized at the time she went to PCRC, that she may have produced a false negative on the culture that was documented in the record, and that she may have been an MRSA carrier all of which played a signifi *815 cant part in the district court’s decision to strike Dr. Selznick’s affidavit, are based upon his guess that the note in the file was incorrect in stating that an MRSA screen had been performed and came out negative. A simple telephone call to Dr. Zimmerman, the author of the note, might have sufficed to definitively answer the question.
Nield further contends that Dr. Coffman’s testimony is speculative because he could neither rule in, nor out, any particular source of Nield’s infections. That is, although he postulated quite a number of potential sources of the infections, he could not state that she contracted the infections from any of the possible sources. “An expert opinion that merely suggests possibilities, not probabilities, would only invite conjecture and may be properly excluded.” Slack v. Kelleher, 140 Idaho 916, 923, 104 P.3d 958, 965 (2004). Further, while Dr. Coffman lists the various possible sources of infection, he does not state in his affidavit that evidence in the record supports the application of any particular possibility. In other words, Dr. Coffman opines that a person can contract MRSA through contact with someone who has an active infection, someone who is MRSA colonized but not infected, contact with an object that has been contaminated with MRSA, or breathing in droplets expelled by an MRSA carrier. However, he fails to cite to any evidence in the record indicating that Nield had contact with any of these potential sources. There is nothing in his deposition indicating that he was aware of any contact that Nield had during her stay at PCRC with visitors, staff, other residents, or anyone else. He fails to show in his affidavit that any of the possibilities are founded upon or related to actual facts in the record.[3] Further, he contends that MRSA is ubiquitous in skilled nursing facilities and long-term care facilities but not does point to any evidence in the record that this is the ease with respect to PCRC. Indeed, in his deposition testimony, he seems to testify somewhat to the contrary:
Q. [Nield’s counsel] Did, in your opinion in reviewing all the documents, PCRC violate their infection control policy and procedure?
A. [Dr. Coffman] In what respect?
Q. With respect to the prevention of transmission of MRSA and pseudomonas.
A. Well, we don’t — I don’t think we have any evidence of transmission of those bugs. In fact, I think in that Health and Welfare thing they referenced a report that is probably somewhere in those two big boxes — although I’m not sure of that — that they didn’t have any other cases appear during this time span.
They had some cases that — of people that came in with MRSA, but no — if I’m reading that state report properly, there weren’t any other cases that were identified after admission, with the exception of Ms. Nield.
In this regard, we have often held that “expert opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact to understand the evidence or determine a fact that is at issue.” Karlson v. Harris, 140 Idaho 561, 565, 97 P.3d 428, 432 (2004).
In sum, it was error for the district court to fail to address Nield’s objections to Dr. Coffman’s affidavit before utilizing that affidavit for any purpose in the proceedings.
C. The district court erred in using Dr. Coffman’s affidavit as a yardstick for determining the admissibility of Nield’s affidavits.
Rather than evaluating Dr. Selznick’s affidavit on its own merits, the district court utilized Dr. Coffman’s affidavit as the yardstick against which Dr. Selzniek’s opinions were measured. Because Dr. Selznick did not respond to or rebut every contention *816 in Dr. Coffman’s affidavit, the district court determined that Dr. Selzniek’s affidavit did not measure up to the Rule 702 standard. While an affidavit certainly needs to meet the requirements set out in Rule 702 and the case law decided thereunder, there is no requirement that an expert’s testimony must comply with any standard set out in another expert’s testimony. An expert’s opinion testimony should be judged on its own merits in determining admissibility and not upon what some other expert claims to be the correct standard.
The district court appears to have granted full credibility to the opinions expressed by Dr. Coffman, despite the fact that the court had made no determination regarding the admissibility of his affidavit testimony and despite the speculative nature of his testimony. Even if Dr. Coffman was the gold standard, it was inappropriate for the district court to use his affidavit as the yardstick to measure Dr. Selznick’s testimony or to conclude that, in order to be admissible, Dr. Selznick’s affidavit had to counter every statement contained in Dr. Coffman’s affidavit. Admissibility of expert testimony does not depend on how many opinions the expert gives. It is the quality of the opinions that counts. A medical expert need not address every opinion stated by an opposing expert in order for his affidavit to comply with I.R.E. 702. Once evidence is admitted, it may be insufficient to overcome an opposing party’s summary judgment motion but that is the time for judging whether the expert has covered all of the bases.
In determining whether to admit affidavit testimony, the court must determine whether the affidavit alleges facts, which if taken as true, would render the testimony admissible. Dulaney v. St. Alphonsus Reg’l Med. Ctr., 137 Idaho 160, 163, 45 P.3d 816, 819 (2002). Further:
In determining whether expert testimony is admissible, a court must evaluate the expert’s ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion. Admissibility, therefore, depends on the validity of the expert’s reasoning and methodology, rather than his or her ultimate conclusion.
Coombs v. Curnow, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009) (internal citation omitted). A qualified expert may testify in opinion form where his or her scientific or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. Nothing in these rules requires that an expert’s opinion testimony, in order to be admissible, must be compared to or measured against testimony submitted by an opposing expert.
When evaluating Dr. Selznick’s affidavit testimony, including his appended and incorporated reports, it appears that he reviewed a myriad of records pertaining to Nield’s care, and drew medical conclusions based on the records and his medical knowledge and experience. In addition, it should not be forgotten he was Nield’s treating physician at times. The district court appears to have found him qualified to testify as an expert. Dr. Selznick stated opinions that are beyond the knowledge of a lay jury and which would certainly have been of assistance in determining some of the facts at issue in the case. For instance, in his September 17, 2009 report Dr. Selznick stated that “MRSA is not a community acquired staph but rather a bacteria often acquired nosocomially or as a result of hospitalization.” Nosocomial is defined as “of or being in a hospital or medical facility; esp., of a hospital-acquired disease or infection.” Webster’s New World Dictionary 927 (3rd College Ed.1988).[4] In other words, MRSA is not a staph that one generally acquires out in the community, but one that is often acquired in a hospital or *817 medical facility. Other facts or opinions stated by Dr. Selzniek in his affidavit, which would be beyond the knowledge of, and of assistance to, a lay jury are: that MRSA is a rather virulent[5] microbe resistant to many antibiotics; that MRSA and pseudomonas are communicable and may be spread due to poor infection control practices; that PCRC had poor infection control practices; that Nield’s medical records indicated she was not colonized with MRSA and pseudomonas when she was admitted to the PCRC on August 25, 2007; and that a culture obtained on November 9, 2007, while Nield was hospitalized at PCRC, disclosed she was infected with MRSA and pseudomonas; and that MRSA and pseudomonas were the cause of Nield’s symptoms and injuries. Even if one objects to his ultimate conclusion that Nield contracted both infections at PCRC, these facts would certainly have been of assistance to the trier of fact. So, too, would the reports of Gerber and Frederick regarding the standards applicable to nursing care facilities for prevention and control of infectious diseases and the fact that such practices were not being observed by PCRC. Again, while one may quibble as to the admissibility of the ultimate conclusions made by Gerber and Frederick regarding the source of Nield’s infections, information as to sanitary practices and requirements for preventing infection and whether or not they are being observed would certainly be helpful to the trier of fact. Flat-out exclusion of the testimony of these witnesses was not appropriate, particularly because PCRC did not seek it. PCRC specified certain testimony that it wished to have excluded. Instead of responding to PCRC’s surgical approach, the district court threw out the entire affidavit of Dr. Selzniek without considering whether some of his testimony may have been admissible. The court apparently intended to do likewise with the affidavits of Gerber and Frederick, as indicated in its statement in the memorandum on reconsideration, but does not appear to have analyzed those affidavits or actually ruled upon their admissibility.
As previously noted, the issue here is not ruling out potential diagnoses, but determining the source of the infections that caused Nield’s injuries. There is no dispute as to the diagnosis at issue in the proceedings below — MRSA and pseudomonas infections causing certain injuries. The question to be determined at trial is the source of the infections. Dr. Coffman’s affidavit contains information as to potential sources. So do the affidavits of Dr. Selzniek, Gerber and Frederick. Lay testimony can fill in the gaps.
In this regard, it might be noted that PCRC’s Infection Control Policy and Procedure Manual states: “Hand washing is generally considered the most important single procedure for preventing nosocomial infections.” Nield testified, as follows, about complaints she made of the wound care she received at PCRC:
Q. [PCRC’s counsel] And what are those complaints?
A. [Nield] Those complaints were, number one, they did not wash their hands when they came into the room. A lot of them didn’t.
Q. All of the time or some of the time?
A. Yeah. It was a regular — yeah. It was a regular thing with them. They would not wash their hands. I would even tell them, “Hey, before you touch me, for my health and your health, wash your hands, you know.”
Q. Would they wash then?
A. Sometimes they would, sometimes they wouldn’t.
Q. Any other complaints?
A. Yeah. They wouldn’t put gloves on to change the wound.
Q. Ever?
A. Some nurses did; some didn’t. And I’d say, “You better put gloves on, you know. “Oh, it’s okay. It’s okay.” I said, “No, it’s not okay, because you’re going to either infect me or you’re going to get *818 infected or something. You need to put gloves on.
“Oh, it’s too hard to wrap all of that stuff with gloves on, you know.” It was amazing. I thought, I don’t believe that you would jeopardize your life and my life because you don’t like to wear gloves, because it’s too hard to put a bandage on. And I would, you know, mention it to the nurses. And they’d go, “Oh, yeah, it happens all the time here.”
Q. What percentage of time were people not washing their hands?
A. I would say probably a 60 percent chance that they weren’t.
Q. And then what about not gloving up?
A. Not gloving up? Probably about 60.
Thus, the medical experts lay the groundwork for how these infections can spread. It is not necessary to have expert testimony to establish how the infections may actually have been acquired by a particular patient. On remand, the jury can consider the expert opinions and fact testimony to determine the causation of Nield’s infections and consequent injuries.
Y. CONCLUSION
The district court abused its discretion by admitting Dr. Coffman’s affidavit in evidence without first considering and ruling upon the objections to its speculative nature, by using Dr. Coffman’s affidavit as the standard by which to determine the admissibility of Dr. Selznick’s affidavit, by excluding the entire affidavit of Dr. Selznick, and by failing to consider and rule upon the admissibility of the Gerber and Frederick affidavits and reports. Further, the court erred by requiring Nield to negate any possible source of her infections other than PCRC. Therefore, we vacate the judgment and remand the case for further proceedings consistent with this opinion. Costs on appeal are awarded to Nield.

. After PCRC submitted its moving papers, Nield's counsel took the deposition of Dr. Coffman. In the course of that deposition, Dr. Coffman opined that Nield may have lost her leg due to leukocytoclastic vasculitis, "an autoimmune kind of inflammatory condition.” He first characterized his opinion as "speculation” but then stated, “I think it’s very likely that was the cause.” However, this cause of Nield’s symptoms was not presented to the district court in the summary judgment proceeding and played no part in the district court's analysis. It is something, however, that certainly could have played a role in a trial of the case.

. PCRC harbored the misconception that the district court had actually ruled on the admissibility of Dr. Coffman’s affidavit. It entitled a two-page section of its appellate brief, "The District Court *814 did not abuse its discretion in holding Dr. Coffman’s testimony was admissible.”

. This brings up the question of what documents Dr. Coffman may actually have reviewed. Although he received two boxes of records and attached a list of the documents contained in those boxes to his affidavit, when asked at his deposition if the list of documents in his affidavit was a "current list of the documents that you’ve received and reviewed in this case,” Dr. Coffman replied, "It looks like it, yes. I would say received. I obviously haven’t reviewed all of these, but I received them.” Nowhere does he explain what documents he did not review so it is impossible to determine what his knowledge of Nield’s case actually is.

. In his deposition, when asked if nosocomial refers to a hospital or facility-acquired strain of MRSA, Dr. Coffman responded: "They’re calling them health care associated now, rather than nosocomial, because they want to include nursing homes, dialysis centers, you know, Elks Rehab, doctors’ offices, you know.” He asserted that a community-associated strain of MRSA, which is less resistant to antibiotics than the hospital-associated strain, is becoming more prevalent. On the other hand, Dr. Coffman states in his affidavit that MRSA is "ubiquitous within skilled nursing facilities and long term care facilities.” This would certainly implicate acquisition of the infection at a facility like PCRC.

. In this regard, Dr. Selznick’s opinion differs to an extent from Dr. Coffman's. Dr. Coffman indicated that "MRSA is not more virulent than other strains of staphylococcus.” A medical publication attached to Dr. Coffman’s witness disclosure indicates that the relative virulence of MRSA is a controversial issue.