**THE SUPREME COURT OF THE STATE OF IDAHO**
Docket No. 48492

|  |  |
|---|---|
| JANA MORTENSEN | ) |
|  | ) |
|   Plaintiff-Appellant, | ) |
|  | )   **Boise, January 2022 Term** |
| v. | ) |
|  | )   **Filed: August 30, 2022** |
| JEFFREY B. BAKER, M.D., an | ) |
| Individual, and THE HEALING | )   **Melanie Gagnepain, Clerk** |
| SANCTUARY, LLC, and Idaho | ) |
| Limited Liability Company, | ) |
|  | ) |
|   Defendants-Respondents. | ) |
|  | ) |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Joel E. Tingey, District Judge.

The district court's opinion on summary judgment is <u>reversed</u> and the judgment is <u>vacated.</u>

Points Law, PLLC, Boise, attorneys for Appellant. Michelle Points argued.

Quane McColl, PLLC, Boise, attorneys for Respondent. Vala L. Metz argued.

---

BEVAN, Chief Justice

This appeal arises from an allegation of medical malpractice. Jana Mortensen sought treatment from Dr. Jeffrey Baker at The Healing Sanctuary, LLC, after a hysterectomy failed to resolve symptoms for ongoing pelvic pain. Mortensen alleges that Dr. Baker prescribed Mortensen a 14-day course of "ozone treatment" to be self-administered intravaginally at home. Mortensen allegedly breathed in ozone gas while administering the treatment, which she alleges caused her permanent pulmonary and cardiac injuries. Mortensen filed a complaint against Dr. Baker and The Healing Sanctuary (collectively "Dr. Baker"), claiming medical malpractice. Dr. Baker moved for summary judgment, arguing that Mortensen could not prove causation. The district court conditionally granted Dr. Baker's motion for summary judgment after finding Mortensen had not raised a genuine issue of material fact; however, the court gave Mortensen a specified time to

secure expert testimony on causation. Mortensen did not comply with the deadline. The district court entered summary judgment, denying Mortensen's second request for additional time. The district court also denied her motion to reconsider. Mortensen timely appeals. For the reasons below, we reverse the district court's decision granting summary judgment to Dr. Baker.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background[1]

In December 2018, Mortensen was seen by Dr. Baker at The Healing Sanctuary for pain related to what she believed was a urinary tract infection or pain resulting from her hysterectomy. Dr. Baker ordered a urine culture, which came back negative for a urinary tract infection. Even so, Dr. Baker diagnosed Mortensen with a suspected urinary tract infection, and he prescribed Macrobid antibiotics for 30 days.

The antibiotics did not resolve her symptoms, so Mortensen made another appointment with Dr. Baker in January 2019. At this appointment, Dr. Baker prescribed ozone gas as a treatment.[2] According to Mortensen, Dr. Baker claimed that ozone would "blast" any bacteria causing her infection. Dr. Baker told Mortensen to get the supplies for the ozone treatment "upstairs." Based on Mortensen's account, Dr. Baker did not write an order for the ozone, but he reviewed and electronically signed her medical record. Mortensen went upstairs at The Healing Sanctuary to obtain the ozone treatment supplies.

Once she arrived, Mortensen told the staff that Dr. Baker sent her for ozone treatment. Staff explained she could administer the treatment at home and provided her with an "insufflation bag" that connected to a tube. Mortensen could reuse the same bag and tube throughout her treatment. Staff told her to come into the office daily and refill the bag with ozone. Once filled, Mortensen was to go home, lie down, insert the tube two to three inches into her vagina, and squeeze the gas into her vaginal canal after releasing the stopper. Staff told Mortensen to remain laying down for

---

[1] Given the posture of this appeal coming to us after a grant of summary judgment, we liberally construe the facts in favor of Mortensen as the non-moving party. *Dep't of Fin., Sec. Bureau v. Zarinegar*, 167 Idaho 611, 629, 474 P.3d 683, 701 (2020). We recognize that affirmative statements and allegations repeated herein are subject to challenge by Dr. Baker at trial.

[2] This case involves a substance called ozone gas, chemically designated as "$O_3$." According to materials Mortensen provided the district court, the FDA notes that ozone is a toxic gas without a known medical application. Administration methods include injections into the ligaments, muscles, joints, and "insufflation." Insufflation, the method of administration relevant here, is when ozone is delivered into a bodily cavity through a cannula or a bag.

fifteen minutes and then "go about her day." Neither Dr. Baker nor the staff gave Mortensen any warnings about possible side effects from the gas.

Mortensen soon noticed, because of the distinct odor of ozone, that once she began treatment at home, the gas leaked from her vaginal canal into the air in the room. As a result, Mortensen claims she inhaled the escaped gas. She also alleges the odor of ozone was detectable for several hours after treatment each day. Even so, Mortensen continued returning to The Healing Sanctuary every morning to get the bag refilled with ozone.

After a short number of self-applied treatments, Mortensen began suffering a sore throat and severe cough. She reported these symptoms to The Healing Sanctuary's staff. She asked if the gas could cause these symptoms, but was told "no," and that it was more likely she caught a cold. At a later visit, when Mortensen was having the bag refilled, she reported that a lot of gas was leaking into the air. A nurse remarked, Mortensen "must have a 'tiny canal,'" but did not otherwise comment on the potential toxicity of ozone. Another nurse told Mortensen it was fine to breathe the gas, saying it would "be good for [her] lungs." Even still, a staff member commented that she noticed a small hole in the bag while refilling it and noted the gas made her cough for a while.

By February 2019—twenty days after Mortensen began her ozone treatment—Mortensen felt like her lungs were collapsing. She was having severe shortness of breath and a persistent sore throat. In mid-February, she went to Community Care Clinic, an urgent care medical facility, and was prescribed an inhaler and steroid.

At Mortensen's next visit to The Healing Sanctuary, she told the nurses she had been to Community Care because of her trouble breathing. The staff insisted inhaling ozone did not cause her breathing symptoms. As a result, Mortensen continued treatment for a few more days but stopped after she felt her lung function was declining and she experienced "severe heart and lower body function issues." Mortensen and her fiancé then researched using ozone in a clinical setting, and Mortensen suspected the gas—not a cold—was causing her health issues.

Following her exposure, Mortensen went to the emergency room for asthma and heart issues several times and has remained under the regular care of Idaho Falls Pulmonary/Sleep and Critical Care Specialists. She was also treated by a pulmonologist in Boise, Idaho, and claims she has persistent chest pain, shortness of breath, a chronic cough, and occasional bloody sputum.

**B. Procedural Background**

Mortensen filed a complaint against Dr. Baker and The Healing Sanctuary alleging medical malpractice on November 13, 2019. In April 2020, Dr. Baker moved for summary judgment contending there was no genuine issue of material fact because Mortensen had provided no experts who could establish: (1) a violation of the community standard of healthcare practice under Idaho Code section 6-1012[3]; and (2) causation or damages.

On May 1, 2020, Mortensen responded to Dr. Baker's motion for summary judgment and moved for more time, under I.R.C.P. 56(d). The next month, on June 9, 2020, Mortensen filed sworn declarations from: (1) Jana Mortensen, (2) Dr. Amy Baruch, and (3) Dr. Edmund Schoeffler. Later, on June 16, 2020, Mortensen submitted a second declaration from Dr. Baruch.

On June 22, 2020, the district court entered its memorandum decision and order conditionally granting Dr. Baker's motion for summary judgment, but the court granted Mortensen another 90 days to provide evidence of causation between Dr. Baker's alleged negligent conduct and Mortensen's purported injuries. Within the 90 days, on September 21, 2020, Mortensen filed a supplemental declaration and supplemental response to Dr. Baker's motion for summary judgment. Dr. Baker then filed a supplemental brief responding to Mortensen's filings.

On October 2, 2020, the district court entered an order and judgment granting Dr. Baker's motion for summary judgment and dismissing Mortensen's claim. Mortensen moved for reconsideration and filed additional declarations from Dr. Jess Mandel and Dr. Ronald Balkissoon on October 16. The district court denied her motion for reconsideration. Mortensen timely appealed.

## II. STANDARDS OF REVIEW

This Court reviews a challenge to the district court's evidentiary rulings, including whether to exclude expert testimony, under an abuse of discretion standard. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50–51, 995 P.2d 816, 820–21 (2000). When reviewing a lower court's decision for an abuse of discretion, this Court must analyze "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4)

---

[3] The defendants' motion for summary judgment included the assertion that Mortensen had no expert to establish the community standard of care as required by Idaho Code section 6-1012; however, the defendants' memorandum in support of summary judgment did not argue this point and focused solely on causation. The district court's later decisions did likewise. We do the same.

reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

"This Court employs the same standard as the district court when reviewing rulings on summary judgment motions." *Owen v. Smith*, 168 Idaho 633, 640, 485 P.3d 129, 136 (2021) (citing *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 140–41, 456 P.3d 201, 209–10 (2019)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). A moving party must support its assertion by citing particular materials in the record or by showing the "materials cited do not establish the. . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s]." I.R.C.P. 56(c)(1)(B). "Summary judgment is improper 'if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented.'" *Owen*, 168 Idaho at 641, 485 P.3d at 137 (quoting *Trumble*, 166 Idaho at 141, 456 P.3d at 210). A "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Id*.

"[W]hen reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Tricore Invs., LLC v. Est. of Warren through Warren*, 168 Idaho 596, 485 P.3d 92, 106 (2021) (quoting *Drakos v. Sandow*, 167 Idaho 159, 162, 468 P.3d 289, 292 (2020)).

### III. ANALYSIS

Mortensen asserts two arguments on appeal. First, Mortensen argues the district court erred in granting Dr. Baker's motion for summary judgment by finding that Mortensen and Dr. Baruch's declarations were inadmissible. Second, Mortensen argues the district court erred by denying her motion for reconsideration and not considering the new evidence presented to support that motion. For the reasons below, we reverse the district court's decision granting summary judgment against Mortensen.

### A. The district court erred in granting summary judgment against Mortensen.

The district court granted summary judgment against Mortensen on her claim of medical malpractice, concluding the declarations Mortensen submitted failed to create a disputed issue of material fact on causation.

Below, in response to Dr. Baker's motion for summary judgment, Mortensen submitted declarations from three individuals: Dr. Schoeffler, Jana Mortensen, and Dr. Baruch. The district court found Dr. Schoeffler offered no opinion on whether the ozone treatment caused Mortensen's injuries and that his declaration failed to create an issue of fact on causation. Mortensen does not challenge this conclusion on appeal, so we do not consider it here. But the district court further found that Mortensen's declaration failed to create a disputed issue of material fact because nothing in the record established she had the training or expertise to even offer an opinion on ozone treatment. Similarly, in evaluating Dr. Baruch's declaration, the district court found that her testimony presented "no evidence of personal experience, training, or treatment relating to the complications possibly arising from Ozone treatment."

In a general negligence case, the plaintiff must establish: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Johnson v. Wal-Mart Stores, Inc.*, 164 Idaho 53, 56, 423 P.3d 1005, 1008 (2018). Medical malpractice cases, such as the one here, elevate the legal requirement to establish these elements by what this Court has called a "stricter burden of proof." *Jones v. Crawforth*, 147 Idaho 11, 16, 205 P.3d 660, 665 (2009). This is because Idaho statutes require plaintiffs in these cases to offer evidence of the duty and the breach of that duty through "direct expert testimony of the standard of health care practice of the community. . . ." I.C. § 6-1012; *see also* I.C. § 6-1013 ("The applicable standard of practice and [the medical provider's] failure to meet that standard must be established. . . by testimony of one (1) or more knowledgeable, competent expert witnesses.").

That said, "[n]othing in Idaho Code sections 6–1012 or 6–1013 requires that proximate cause be proved by expert testimony—those statutes only address the applicable standard of care and breach of that standard." *See Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 785, 25 P.3d 88, 98 (2001). As a result, the Idaho Rules of Evidence govern the admission of testimony to prove proximate cause in medical malpractice cases. *Id*. And "[a]lthough the Idaho Rules of Evidence do not require expert testimony to establish causation in medical malpractice cases, such testimony is often necessary given the nature of the cases." *Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009). Expert testimony is often required because "the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury." *Flowerdew v. Warner*, 90 Idaho 164, 170, 409 P.2d 110, 113 (1965). When the case involves highly technical

6

medical questions, the testimony of medical experts is required to establish causation. *Ackerschott v. Mountain View Hosp., LLC*, 166 Idaho 223, 231, 457 P.3d 875, 883 (2020).

Mortensen argues the district court erred in granting Dr. Baker's motion for summary judgment for two reasons: first, she contends her own declaration contained testimony on causation that created a genuine issue of material fact and, second, she asserts that Dr. Baruch's declaration was admissible, and its contents also raised a genuine issue of material fact on causation. Dr. Baker counters that the district court correctly concluded admissible expert testimony must prove causation, and Mortensen's declaration was inadmissible because her opinions lacked foundation, were conclusory, and speculative.

1. *Jana Mortensen's declaration and supplemental declaration.*

Mortensen first suggests her declaration was admissible and the district court erred in concluding that because she was not a physician, she could not testify that her inhalation of a toxic gas caused her to suffer injury or damage.

"Summary judgment proceedings are decided on the basis of admissible evidence." *Campbell v. Kvamme*, 155 Idaho 692, 696, 316 P.3d 104, 108 (2013). Thus

> [t]he admissibility of evidence contained in affidavits and depositions in support of or in opposition to a motion for summary judgment is a threshold matter to be addressed before applying the liberal construction and reasonable inferences rule to determine whether the evidence creates a genuine issue of material fact for trial.

*Fragnella v. Petrovich*, 153 Idaho 266, 271, 281 P.3d 103, 108 (2012) (citations omitted). Declarations submitted on summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the. . . declarant is competent to testify on the matters stated." I.R.C.P. 56(c)(4). Also, sworn or certified copies of all papers or parts of papers referred to in the affidavit must be attached to or served with the affidavit. *Id.*

On appeal, Dr. Baker argues the district court properly excluded Mortensen's declaration because she is not an expert and, thus, she was unqualified to testify on causation. Dr. Baker asserts that whether the medical care Mortensen received caused or contributed to any injuries is a matter of science and only a qualified expert witness can offer such testimony. The difficulty here is that the district court gave short shrift to Mortensen's affidavit and failed to make any findings as to what consideration, if any, it accorded to her declarations. The district court simply found that Mortensen, as a lay witness, could not testify to causation. While we generally agree, as we explain below, there are significant portions of Mortensen's declaration and deposition testimony that

7

cover matters she was fully qualified to testify about pertaining to what she observed and experienced throughout her treatment by Dr. Baker and his staff.

Thus, we disagree with the effect of the district court's decision, which essentially concluded that while Mortensen could testify to her own symptoms, none of her testimony provided foundation for Dr. Baruch's expert testimony. The sum of the district court's decision to exclude Mortensen's declaration is as follows:

> Mortensen in her Declaration testifies as to the circumstances of her claim, symptoms experienced, statements from other medical providers, and her opinion regarding the medical care provided by Defendants. Understandably, Defendants object to much of the Declaration.

> This [c]ourt agrees that causation in this case must be established by expert testimony. There is nothing in the record to reflect that Mortensen has the training, experience, and medical expertise to offer an opinion as to the ozone treatment and whether it caused any ailments. Furthermore, Mortensen's recitation of "research" is inadmissible hearsay. In short, while Mortensen may testify regarding the treatment provided and her knowledge of her own symptoms, she is not qualified to establish a nexus between the ozone treatment and her alleged injuries.

> Accordingly, Mortensen's Declaration fails to create a disputed issue of fact as to causation.

When the district court issued this decision, Mortensen had moved for more time, which the district court granted to allow her 90 days to supplement the record. She later filed a supplemental declaration, attesting to recent testing she had undergone at National Jewish Health in Denver, Colorado. When the 90-day extension lapsed, and the district court issued its revised order, the court concluded that Mortensen's supplemental declaration still failed to raise a genuine dispute of fact because she was not an expert: "As previously indicated, causation in this matter must be established by expert testimony…With this conclusion, the issue now before the [c]ourt is whether the recent declaration of the Plaintiff satisfies the requirement of expert testimony."

The district court determined Mortensen's declaration "contains statements of what Plaintiff was told by medical providers, Plaintiff's explanation of test results, what Plaintiff was told about test results, copies of medical records prepared by third parties, and copies of articles or data regarding ozone prepared by third parties." Finally, the district court determined that Mortensen was "not qualified to testify as to causation and any such testimony lacks foundation."

While we agree Mortensen is not qualified as an expert to offer a medical opinion, we have never held that a party injured by medical malpractice cannot testify to their own symptoms. *See*

8

*Herrett v. St. Luke's Magic Valley Reg'l Med. Ctr., Ltd.*, 164 Idaho 129, 136, 426 P.3d 480, 487 (2018) (explaining that even though lay witnesses may not testify to medical causation, they can testify to witnessing a deterioration in symptoms). Although the district court made passing reference to the admissibility of such evidence from Mortensen, the court offered no further analysis in that regard.

Mortensen does not argue on appeal, nor did she argue below, that she was qualified to testify as an expert. Indeed, Mortensen must establish causation through expert testimony in this case. *See Holdaway v. Broulim's Supermarket*, 158 Idaho 606, 611, 349 P.3d 1197, 1202 (2015) (explaining the district court did not err in holding plaintiff "may testify as to the pain he feels, where the door allegedly hit his leg, and the sequence of events," but could not "set forth any opinion as to the cause of the injury that would require medical knowledge outside of the 'usual and ordinary experience of the average person."); *Bloching v. Albertson's, Inc.*, 129 Idaho 844, 846, 934 P.2d 17, 19 (1997) ("a lay person is not qualified to give an opinion about a medical diagnosis."); *Flowerdew*, 90 Idaho at 172, 409 P.2d at 172 (patient was not qualified to testify that his injury was caused by physician's treatment). She is, however, qualified to testify about her own personal experiences based on her personal knowledge. As a lay witness, Mortensen's testimony is governed by Idaho Rules of Evidence 701:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

I.R.E. 701.

Admissibility is a threshold question that the district court must undertake, which requires the district court to examine Mortensen's declaration under I.R.E. 701. If the declaration contains inadmissible statements, the district court must strike those statements. *Fragnella*, 153 Idaho at 276, 281 P.3d at 113 (holding that the district court did not abuse its discretion in striking portions of an affidavit that lacked foundation). Any portion of Mortensen's declaration not based on her own personal observation were properly stricken.

But in Mortensen's first declaration, she stated: "I began suffering from very substantial bleeding, to the extent that Dr. Baker had to order a blood transfusion after he apparently realized

9

that his experimental drug could not possibly help with the fibroid**.**" While the first portion of her statement describes an admissible, personal observation, including that she received a transfusion, the second portion as to why she was bleeding is inadmissible as offering medical opinion. This distinction was not noted by the district court. Likewise, Mortensen declared, "[t]he subpar medical care that I was given through the non-existent briefing regarding the toxic nature was a continuation of a bad pattern that started back in October 2017." This statement is entirely inadmissible as improper lay testimony. However, her next statement that "[m]y last self-administered 'ozone treatment' was February 11, 2019," is clearly admissible. Of note, Mortensen's first declaration included a narrative statement detailing her day-to-day symptoms:

> I have frequent pain, sometimes extreme, palpitations, skipped beats, squeezing, shortness of breath, and general "weirdness." This often causes fatigue at the same time, and often coincides with my lung pain and shortness of breath. I have daily symptoms, but it goes in cycles so that some days are much worse than others. The changes in my life since that time are severe and depressing as I can no longer support my clients as a social worker as I did prior to the ozone inhalation[.] I have cancelled my gym membership and can no longer do yoga or the activities I loved before like hiking. In addition to that, it is important I mention that in light of my inability to predict the severity of my daily symptoms and the level of suffering, I am unable to continue my work as a social worker. I am in the process of refinancing my house to support my needs and my minor son's needs while I can no longer be employed at this time.

This entire narrative is admissible. It provides evidence of Mortensen's injuries and the effect of them upon her life and her finances. Much of Mortensen's declaration contains factual statements like this one, which are based on her personal knowledge that will not be repeated here.

In her supplemental declaration, Mortensen also testified: "I had absolutely no prior lung issues, other than a dormant case of asthma as a kid, as evidenced by my prior medical history, and now my lungs are in a state where they are inflamed, swollen and full of mucus with serious obstruction on one side a year and half since the [ ] inhalation of ozone, which has been described to me as indicative of chronic, long term damage." Everything in this statement is admissible up to her testimony about what a third party described to her; that portion is hearsay.

Apart from her declaration, Dr. Baker deposed Mortensen and she gave the following testimony:

> Q. So after the first time that you utilized the medical ozone on January 24th, did you experience any symptoms, any problems, any concerns whatsoever?
>
> A. After the first time?

Q. The first time.

A. Yeah. I started to getting [sic] sore throats rather quickly.

…

Q. Is that the only symptom you had at that time?

A. It was—Yeah. Severe sore throats that first week.

Further into the deposition, Dr. Baker's attorney asked Mortensen if she recalled having symptoms from the ozone treatment on January 30th. Mortensen testified:

A. So the sore throat got really bad, so by that—by like Wednesday, it quickly went from, like, "Oh, bad sore throat," to like, "This is the worst sore throat I've ever" -

It hurt really bad. I couldn't even hardly swallow. But it was still, "This isn't an ozone side effect." She [the nurse]—you know, "This isn't"—anytime I reported anything odd, it was never the ozone.

…

Q. When did the lung stuff come in?

…

A. It was, like, the evening—the evening before I went into Community Care, which the Community Care record is in there, so the date's on there.

So the evening before that, along with the sore throat was like my lungs are closing in on me.

Q. Okay.

A. So –

Q. Can you be more specific in describing that?

A. It was the weirdest thing I've ever felt. It—my lungs—

I just couldn't breathe. It felt like I was breathing through, like a tiny little straw. They just—

Q. So that's the best description you can give me, what you've just said?

A. Like I can't breathe.

Throughout the deposition, Mortensen continued to describe symptoms she experienced, including ongoing sore throat, pain in her lungs, and difficulty breathing. She also recounted visiting urgent care and returning to Dr. Baker's office to explain her symptoms to The Healing Sanctuary staff. This deposition testimony, coupled with Mortensen's Community Urgent Care records that Dr. Baruch reviewed before preparing her declaration, was based on Mortensen's own personal knowledge and should have been ruled admissible by the district court.

11

An abuse of discretion occurs when the lower court does not perceive the issue as one of discretion. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194. Likewise, a lower court's failure to articulate and apply the relevant legal standard is an abuse of discretion. *See Crowley v. Critchfield*, 145 Idaho 509, 513, 181 P.3d 435, 439 (2007).

The district court here did not cite any applicable case law or other legal standards for admissibility when it excluded Mortensen's declaration. It is impossible from the district court's pronouncements to deduce what, if anything, was considered as admissible here. The district court found only that Mortensen was not qualified to testify about causation and that her opinions recited research that was inadmissible hearsay. While we agree that some of Mortensen's statements contain hearsay, speculation, and inadmissible medical conclusions, she also recalled what she experienced and how she felt—and she related those facts throughout her deposition and declarations. These statements are admissible. As a result, the district court abused its discretion by (1) failing to articulate the standards it was relying on and (2) excluding Mortensen's testimony and declarations with no discussion or reasoning to establish what was inadmissible and what should have been considered for purposes of summary judgment.

That said, Mortensen's declaration is not, standing alone, sufficient for her claim to survive summary judgment. As Dr. Baker argued, and the district court found, Mortensen cannot testify, absent qualified expert testimony, how ozone caused her injuries. But Mortensen's factual history can lay the foundation for Dr. Baruch to testify to causation. *See Dlouhy v. Kootenai Hosp. Dist.*, 167 Idaho 639, 647, 474 P.3d 711, 719 (2020) (quoting *Grover v. Smith*, 137 Idaho 247, 252, 46 P.3d 1105, 1110 (2002)) ("An expert's review of a deposition . . . coupled with the expert's personal knowledge. . . is sufficient to lay a foundation for the expert's opinion.") *Herrett v. St. Luke's Magic Valley Reg'l Med. Ctr., Ltd.*, 164 Idaho 129, 136, 426 P.3d 480, 487 (2018) (discussing the foundational requirements of Idaho Rule of Evidence 703).

Thus, while we conclude the district court abused its discretion in failing to articulate the portions of Mortensen's declaration that were inadmissible, we conclude Mortensen's declaration was only admissible in part. Specifically, Mortensen can testify to her own personal observations and statements made by Dr. Baker or his nurses or staff. These facts, when properly considered, lay the foundation for Baruch's testimony, discussed below.

    2. *Dr. Baruch's declaration.*

Next, the district court excluded Dr. Baruch's declaration, concluding it lacked foundation and was not scientifically sound. On appeal, Dr. Baker contends this was correct because Dr. Baruch's opinion was speculative and conclusory. Dr. Baker argues Idaho Rule of Evidence 702 imposes a strict requirement and that scientific or other specialized knowledge must help the trier of fact understand the evidence. As we discussed above, Mortensen's testimony provided a foundational basis for Dr. Baruch's opinions. Dr. Baruch's own education, experience, review of pertinent records, and Mortensen's testimony qualified Dr. Baruch to offer her opinions on causation. The district court erred in ruling otherwise.

The proponent of expert testimony must lay a foundation for the testimony. To that end, "[t]he foundation for the admission of opinion testimony based upon scientific knowledge includes both that the witness is an expert in the field and that there is a scientific basis for the expert's opinion." *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 593, 67 P.3d 68, 72 (2003). "This means that courts must review both 'the expert's qualifications and the records relied upon by the expert to determine whether the expert can establish the necessary foundation.'" *Secol v. Fall River Med., PLLC*, 168 Idaho 339, 351, 483 P.3d 396, 408 (2021) (quoting *Brauner v. AHC of Boise, LLC*, 166 Idaho 398, 406, 459 P.3d 1246, 1254 (2020).

Idaho Rule of Evidence 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." I.R.E. 702. This Court has held, "that it is incumbent upon an expert to set forth specific facts upon which an opinion is based." *J-U-B Engineers*, 146 Idaho at 316, 193 P.3d at 863. Like the admissibility of testimony for lay witnesses, the admissibility standard for experts

> is a threshold matter that is distinct from whether the testimony raises genuine issues of material fact sufficient to preclude summary judgment. With respect to the threshold issue of admissibility, the liberal construction and reasonable inferences standard does not apply. Instead, the trial court must look at the witness' affidavit or deposition testimony and determine whether it alleges facts which, if taken as true, would render the testimony of that witness admissible.

*Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 473, 337 P.3d 627, 632 (2014) (citations and internal quotation marks omitted).

On appeal, Mortensen contends that though Dr. Baruch's testimony was limited to short-term effects from inhaling ozone, she only needed to establish that ozone caused Mortensen some

injury. In that regard, Mortensen argues Dr. Baruch is a qualified expert and her testimony would have assisted the trier of fact in determining the cause of Mortensen's injury.

In addressing Dr. Baruch's declaration, the district court reasoned:

> There is nothing in her Declaration to support an inference that [Dr. Baruch's] opinion is based on personal knowledge and experience. Baruch does refer to publications…but her reliance upon such publications is problematic[.] [T]here is nothing in the record to reflect that the publications relied upon by Baruch are 'learned treatises' such that they would be admissible pursuant to Rule 803(18), IRE…

Based on this analysis, the district court found that Dr. Baruch's opinion on causation was "not scientifically sound" and lacked the foundation necessary to make it admissible because she had no personal experience working with ozone treatment. However, as discussed below, there was good reason for her lack of experience: the treatment she was describing has not been medically approved.

"If the reasoning or methodology underlying [an] opinion is not scientifically sound, then the opinion will not assist the trier of fact to understand the evidence or determine a fact in issue." *Swallow*, 138 Idaho at 592, 67 P.3d at 71. "The foundation for the admission of opinion testimony based upon scientific knowledge includes both that the witness is an expert in the field and that there is a scientific basis for the expert's opinion." *Id.* at 593, 67 P.3d at 72.

Because the district court has discretion to determine whether a proper foundation has been laid for the admission of expert testimony, the district court also has discretion to determine whether the witness is qualified as an expert in the field and whether there is a scientific basis for the expert's opinion. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 54, 995 P.2d 816, 824 (2000); I.R.E. 104(a)**.** Thus, this Court reviews a challenge to the district court's evidentiary rulings, including whether to exclude expert testimony, under an abuse of discretion standard. *Id.* at 50–51, 995 P.2d at 820–21.

In her declaration, Dr. Baruch, an Idaho licensed physician, board certified in emergency and integrative medicine, testified her opinions were based on "my review of materials provided to me by Ms. Mortensen's attorney…my education and experience as an Emergency Medicine and Integrative Medicine physician." She then declared:

> In my professional opinion, there is no medical indication for ozone therapy as a primary or adjunctive therapy and it is unsafe and unreasonably dangerous. It is a known toxic air pollutant…*I believe the immediate respiratory symptoms that Jana*

14

*Mortensen developed during her treatment with ozone therapy were directly related to the ozone therapy prescribed by Jeffrey Baker MD.*

…

Based on my research, studies of ozone therapy for the use of urinary tract infections are limited case studies and do not substantiate its use.

…

The FDA expressly states that a device that generates ozone by design or as a byproduct should not exceed 0.05 ppm by volume of air circulating through the device or cause an accumulation of zone in excess of 0.05 ppm by volume of air. The ozone that Jana Mortensen received was at a concentration of 40 ppm daily from January 25, 2019—February 14, 2019. She was prescribed 30 days but terminated the therapy after suspecting that her respiratory symptoms were due to the ozone therapy.

. . .

Jeffrey Baker MD documented in a pre-operative evaluation dated January 16, 2018 that the patient had a history of asthma. A prior asthma diagnosis would have been a clear contraindication to ozone therapy.

. . .

*It is my opinion that her acute respiratory symptoms were directly related to the ozone therapy prescribed by Dr. Baker.*

(Emphasis added).

On appeal, Dr. Baker argues these opinions lacked foundation, were speculative, and conclusory. We disagree. The qualifications for an expert witness set out in Rule 702—"knowledge, skill, experience, training, or education"—are disjunctive requirements. I.R.E. 702. A party can lay a proper foundation for an expert witness using any, all, or some combination of these factors.

Dr. Baruch based her testimony on her review of Mortensen's (1) medical records from The Healing Sanctuary; (2) deposition testimony Mortensen gave describing her symptoms and the timing of those symptoms after receiving ozone treatment; (3) Community Care Urgent Care records; (4) and her own education and experience as an emergency medicine and integrative medicine physician. She also included the FDA's guidance on ozone use and a publication she relied on to form her opinion: Giusseppe Bonforte, et al., *A Potential Adjunct Approach to Lower Urinary Tract Infections?* A Case Series Report (2013). We also glean from her curriculum vitae submitted as an attachment with her declaration that she has nearly 30 years' experience in the

15

medical field, including in international medicine, and as noted, she is board certified in emergency medicine and integrative medicine.[4]

First, to address the publications that Dr. Baruch relied on, the district court found Dr. Baruch's reliance on publications, including the FDA and EPA's website, was insufficient. The district court reasoned, "there is nothing in the record to reflect that the publications relied upon by Baruch are 'learned treaties' such that they would be admissible pursuant to Rule 803(18)[.]" However, under Idaho Rule of Evidence 703, publications need not be deemed "learned treatises" for experts to rely on them:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion or inference on the subject, they need not be admissible for the opinion to be admitted.

While "expert testimony that does nothing more than relay otherwise inadmissible hearsay. . . is barred by I.R.E. 703," *State v. Stanfield*, 158 Idaho 327, 341, 347 P.3d 175, 189 (2015), experts may rely on inadmissible materials if the materials are of the kind other experts in the field would rely on. *See Brauner v. AHC of Boise, LLC*, 166 Idaho 398, 405, 459 P.3d 1246, 1253 (2020). Dr. Baruch's reliance on the FDA and EPA publications specifically identified that ozone has no authorized medical purpose and no approved medical device, thus neither she nor any other medical expert would have access to materials identifying acceptable medicinal uses. The FDA and EPA are the only regulatory agencies that could authorize ozone as a medical treatment and identify the level of ozone, if any, that is safe to breathe. Thus, the district court's conclusion that Dr. Baruch's reliance on these publications was inadmissible was erroneous. These are the type of publications other experts in the field would reasonably rely on—they are the only type of publications that experts *could* reasonably rely on for a treatment that is not medically approved.

Second, the district court did not address the test for qualifications of an expert witness or Dr. Baruch's qualifications as an expert. Instead, after the district court found the publications Dr. Baruch's relied on were not learned treatises, the court simply concluded, "there is no scientific

---

[4] Dr. Baruch's international medicine experience includes a course in travel medicine with the London School of Hygiene & Tropical Medicine and a diploma in clinical and tropical medicine and hygiene. She also attended a medical seminar in wilderness medicine in Everest Trek, Nepal, and she completed an internal medicine rotation at the University of Panama in Panama City, Panama.

basis for the expert's opinion, and the reasoning and methodology is not scientifically sound, the opinion is not beneficial to the trier of fact and is inadmissible."

Applying the correct legal standards for Dr. Baruch's education, specialized knowledge, and nearly thirty years of experience shows she met the test outlined in I.R.E. 702 to establish herself as an expert. *See Brauner v. AHC of Boise, LLC*, 166 Idaho 398, 405, 459 P.3d 1246, 1253 (2020) (explaining a life care planner had the foundation to qualify as an expert to testify about future expenses based on her curriculum vitae detailing decades of work in the field, training, and experience). We conclude that Dr. Baruch, utilizing Mortensen's factual account from her deposition testimony along with her own review of Mortensen's medical records, and the EPA and FDA publications, had sufficient foundation to testify to causation.

The district court based its reasoning for excluding Dr. Baruch's declaration, in part, on this Court's rationale in *Swallow v. Emergency Med of Idaho, P.A.*, 138 Idaho 589, 67 P.3d 68 (2003). In *Swallow*, this Court held that a medical expert's (Dr. Tommaso) testimony that a Cipro overdose caused the plaintiff's heart attack was inadmissible. 138 Idaho at 598, 67 P.3d at 77. During his deposition, Dr. Tommaso testified he did not know how Cipro could cause a heart attack, but said he was "aware from the PDR [Physicians' Desk Reference] and from the FDA that Cipro can precipitate a myocardial infarction. How it does it, I don't know." *Id.* at 593, 67 P.3d at 72.

Dr. Tommaso had relied on eleven FDA adverse reaction reports about Cipro to form his opinion. *Id.* at 594, 67 P.3d at 73. In ten of the reports, patients who took Cipro suffered a myocardial infarction; in an eleventh report, the patient committed suicide. *Id*. The FDA adverse reaction reports concluded that the ten instances when Cipro resulted in a patient's myocardial infarction were based "solely upon the temporal relationship between the administration of Cipro and the adverse cardiac event." *Id*. The ten adverse events had occurred between 1989 and 1997 and the reports did not reveal whether the cardiac events were statistically significant. In sum, the FDA, and by extension Dr. Tommaso, could not speak to whether patients administered Cipro had a greater likelihood of suffering a myocardial infarction than those who suffered the adverse event by chance. *Id.* This Court held that the district court did not abuse its discretion in ruling the doctor's opinion testimony lacked foundation because the doctor failed to explain how Cipro caused a myocardial infarction. *Id*.

17

There is little relationship between *Swallow* and this case. Of course, causation cannot be established from a mere temporal association—the problem in *Swallow*—correlation does not prove causation. Here, while Dr. Baruch states that Mortensen's symptoms are "temporally related to the administration of ozone," that is not the sole fact on which she relied. Unlike *Swallow*, Dr. Baruch did not *conclude* Mortensen's symptoms were based "solely upon the temporal relationship" between her acute symptoms and inhaling ozone. Instead, Dr. Baruch continued, "[i]t is my opinion that [Mortensen's] acute respiratory symptoms were directly related to the ozone therapy prescribed by Dr. Baker." Dr. Baruch bolstered this conclusion with the statement, "[b]ased on my research, studies of ozone therapy for the use of urinary tract infections are limited case studies and do not substantiate its use. The FDA specifically states that 'ozone is a toxic gas with no known useful medical application in specific, adjunctive, or preventive therapy. . . .'" Dr. Baruch's statement cited to a footnote referencing an FDA case study. This opinion, supported by empirical data, combined with the other statements in her declaration, are admissible and raise a genuine dispute of material fact on causation. These conclusions were based on her thirty years of medical experience, her review of treatises and FDA information, and her review of Mortensen's deposition.

For these reasons, we hold the district court abused its discretion when it excluded Mortensen and Dr. Baruch's testimony. As a result, Dr. Baker was not entitled to summary judgment because the excluded testimony created a genuine issue of material fact.

**B.     This Court need not resolve the other issues raised by Mortensen on appeal.[5]**

This Court need not address Mortensen's claim that the district court erred in denying her motion for reconsideration because we reverse the district court's entry of summary judgment. Although Mortensen is not qualified to testify on causation, she can testify about her symptoms. Dr. Baruch's testimony, based in part on her review of Mortensen's testimony about those symptoms, raises a genuine dispute of material fact as to whether the ozone treatments caused her injuries. Thus, it is unnecessary to reach the other issues raised by Mortensen concerning whether the district court abused its discretion by (1) ruling that she could not opine on the ultimate issue

---

[5] Similarly, because we hold that Dr. Baruch's expert testimony on causation is admissible, we need not reach Dr. Baker's argument on cross-appeal that Mortensen waived her right to argue causation could be inferred absent expert testimony.

of fact, (2) denying her request for additional time to gather evidence on causation, and (3) not considering the late submission of declarations from two other doctors.

## VI. CONCLUSION

We reverse the district court's decision granting summary judgment in favor of Dr. Baker and The Healing Sanctuary. Neither party requested attorney fees on appeal. As the prevailing party, Mortensen is entitled to costs as a matter of course.

**Justices STEGNER and MOELLER CONCUR**

**ZAHN, J. dissenting**

I respectfully dissent from the majority's conclusion that the Dr. Baruch's expert opinion concerning causation had sufficient foundation to be admissible. Dr. Baruch's declaration fails to cite sufficient evidentiary or scientific support for her opinion. As a result, her testimony lacks foundation, is speculative and conclusory, and therefore inadmissible.

The allegations in this case are concerning. I do not discount 21 C.F.R. 801.415(a), which states "[o]zone is a toxic gas with no known useful medical application in specific, adjunctive, or preventive therapy." Nor do I discount Dr. Baruch's statement that "[i]n my professional opinion, there is no medical indication for ozone therapy as a primary or adjunctive therapy and it is unsafe and unreasonably dangerous." However, to be admissible, Dr. Baruch's expert opinion concerning the cause of Mortensen's symptoms must be supported by more than the fact that ozone has no known useful medical application and the temporal proximity between the ozone therapy and Mortensen's symptoms.

Negligence consists of four elements: (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage. *Ackerschott v. Mountain View Hospital, LLC*, 166 Idaho 223, 230, 457 P.3d 875, 882 (2020). Plaintiffs in a medical malpractice case have a "stricter burden" with regard to the first two elements because Idaho law requires them to prove duty and breach through "direct expert testimony of the standard of health care practice of the community." *Id.*, quoting I.C. § 6-1012. Idaho law places no stricter burden, however, with regard to the establishing the third element.

The admissibility of expert testimony on the issue of causation is "governed solely by the Idaho Rules of Evidence." *Secol v. Fall River Medical, P.L.L.C.*, 168 Idaho 339, 483 P.3d 396 (2021). To that end, this Court has held that

19

[a]n expert opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact to understand the evidence or determine a fact that is at issue. When the expert's opinion is based upon scientific knowledge, there must likewise be a scientific basis for that opinion.

*Swallow v. Emergency Medicine of Idaho, P.A.*, 138 Idaho 589, 592–93, 67 P.3d 68, 71–72 (2003).

In *Swallow*, the plaintiff's medical expert testified that she believed the plaintiff's ingestion of Cipro was causally related to his subsequent heart attack because of the temporal relationship between taking the Cipro and his heart attack, and because of his lack of other risk factors. *Id.* at 595, 67 P.3d at 74. This Court affirmed the district court's decision that the expert's testimony lacked sufficient foundation because it amounted to nothing more than speculation based on the temporal proximity of events. *Id.* at 594–95, 67 P.3d at 73–74.

In contrast, this Court found expert medical opinion testimony admissible when the expert provided a scientific explanation of the effect of the drug in question and how it caused a death. *See Coombs v. Curnow*, 148 Idaho 129, 219 P.3d 453 (2009). In *Coombs*, a young child died after prolonged sedation with Propofol. *Id.* at 134–35, 219 P.3d at 458–59. At trial, it was undisputed that the child died from cerebral edema–the sole issue was the cause of the cerebral edema. *Id.* at 135, 219 P.3d at 459. On that issue, the plaintiffs' medical expert testified "that the long-term, high-dose sedation with Propofol produced hypotension and lipemia, which, in combination with Michael's low hemoglobin levels, resulted in decreased blood flow and oxygen to the brain. The lack of oxygen, in turn, caused the cerebral edema." *Id.* The district court refused to accept the expert's opinion as reliable because there were no peer-reviewed, published journal articles directly supporting his testimony, and concluded that without the expert's testimony there was no substantial and competent evidence to support the jury's verdict in favor of the plaintiffs. *Id.* at 136, 219 P.3d at 460.

On appeal, this Court stated that the admissibility of an expert opinion depends on the validity of the expert's reasoning and methodology, rather than his or her ultimate conclusion. *Id.* at 140, 219 P.3d at 464. This Court concluded that the expert's testimony was sufficiently reliable to sustain the jury's verdict because the expert testified that his opinion was based on basic principles of medicine learned in medical school and while working in the ICU, and was based on his familiarity with Propofol in pediatric patients:

Unlike the situation in *Swallow*, Dr. Hammer did not rely solely on the temporal proximity between the administration of Propofol and Michael's death. Instead, he was able to provide a scientific explanation of the effect Propofol had on Michael

20

and how it caused his death. He explained the chain of circumstances leading to the cerebral edema and the large role Propofol played in those events. Accordingly, under *Weeks* and *Swallow*, Dr. Hammer's testimony was sufficiently reliable to prove the doctors' negligence proximately caused Michael's death.

*Id*. at 142–43, 219 P.3d at 466–67.

Turning to this case, I agree with the majority's conclusions that Dr. Baruch was qualified to render an expert medical opinion. I agree that the district court erred when it determined that Dr. Baruch's reliance on a website and publications was "problematic" because she failed to establish that the materials were "learned treatises." I also agree that the district court erred when it rejected Dr. Baruch's opinion, in part, because she "presents no evidence of personal experience, training, or treatment relating to complications possibly arising from ozone treatment."

However, I disagree with the majority's conclusion that Dr. Baruch's opinions had sufficient foundation to be admissible. While Dr. Baruch's declaration contains statements concerning her experience, review of the FDA's website and information gleaned from Mortensen's medical records, it fails to explain how she used that information to arrive at her opinion on causation. In short, although Dr. Baruch references various pieces of information, at no point does she tie them together to explain how she used that information to develop her opinion.

Although there are two declarations from Dr. Baruch in the record, they were both signed on the same day and otherwise appear identical. It therefore appears there is only one declaration from Dr. Baruch, which for unknown reasons was filed twice. I will therefore refer to Dr. Baruch's "declaration," in the singular rather than plural.

The declaration first describes Dr. Baruch's qualifications and the materials she reviewed. Dr. Baruch then discusses Mortensen's medical history related to Dr. Baker's treatment with ozone gas, Mortensen's use of the ozone therapy, Mortensen's development of a severe throat and cough shortly after beginning treatment, and Mortensen's subsequent receipt of a prescription for an inhaler and steroids. Dr. Baruch then states her expert opinions:

**Professional Opinions and Basis for these Opinions:**

11.     In my professional opinion, there is no medical indication for ozone therapy as a primary or adjunctive therapy and it is unsafe and reasonably dangerous. It is a known toxic air pollutant. People exposed to elevated levels of ozone may experience a variety of symptoms, including sore throat, shortness of breath, chest pain and wheezing. These symptoms can last several days. Certain individuals are more susceptible to symptoms, particularly those with preexisting lung disease, such as asthma. *I believe the immediate respiratory symptoms that Jana Mortensen*

21

*developed during her treatment with ozone therapy were directly related to the ozone therapy prescribed by Jeffrey Baker MD.* The scope of my engagement in this case is limited to the immediate or short-term symptoms suffered by Jana Mortensen following the administration of the ozone therapy ordered by Dr. Baker. I have not been engaged to, and thus do (sic) attest to any long-term sequelae of which Ms. Mortensen may allege.

12. Based on my research, studies of ozone therapy for the use of urinary tract infections are limited case studies and do not substantiate its use.[2]

13. The FDA specifically states that "ozone is a toxic gas with no known useful medical application in specific, adjunctive, or preventive therapy. In order for ozone to be effective as a germicide, it must be present in concentration much greater than that which can be safely tolerated by man and animals." The FDA expressly states that a device that generates ozone by design or as a byproduct should not exceed 0.05 ppm by volume of air circulating through the device or cause an accumulation of ozone in excess of 0.05 ppm by volume of air.

14. The ozone that Jana Mortensen received was at a concentration of 40 ppm daily from January 28th (sic), 2019- February 14, 2019. She was prescribed 30 days but terminated the therapy after suspecting that her respiratory symptoms were due to the ozone therapy. The cumulative exposure from ozone therapy does not account for the addition of ground-level pollution from ozone.

15. There is no documentation in the records from Jeffrey Baker MD of a discussion regarding the risks of ozone administration.

16. Jeffrey Baker MD documented in a pre-operative evaluation dated January 16, 2018 that the patient had a history of asthma. A prior asthma diagnosis would have been a clear contraindication to ozone therapy.

17. *Jana Mortensen's symptoms are temporally related to the administration of ozone therapy.* Ms. Mortensen's symptoms are consistent with known side effects, including throat irritation, cough, shortness of breath, burning or discomfort in the chest. Complete health effects are well described on the EPA website: https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-general-population.

18. There is no evidence to support the diagnosis of urinary tract infection at the time the ozone therapy was administered. No repeat culture had been obtained and the patient stated that she was otherwise feeling better except for the abdominal pain. It would have been reasonable to pursue additional investigation into the cause of the patient's symptoms rather than continue therapy for an undiagnosed urinary tract infection.

19. In summary, Jana Mortensen was provided a treatment for an undiagnosed UTI, with unproven benefit and potential serious side effects. *It is my opinion that her acute respiratory symptoms were directly related to the ozone therapy prescribed by Dr. Baker.*

2   See, for example: Ozone Therapy: A Potential Adjunct Approach to Lower Urinary Track Infection? A Case Series Report; Giuseppe Bonforte et al. G Ital Nefrol. Jul-Aug 2013.

(emphasis added). Dr. Baruch's declaration contains three statements of opinion, italicized above, concerning the cause of Mortensen's symptoms.

The two statements in paragraphs 11 and 19 are nearly identical and opine that Mortensen's symptoms were "directly related" to the ozone therapy prescribed by Dr. Baker. The two statements are conclusory and speculative. Dr. Baruch fails to provide any scientific basis for her conclusion. Dr. Baruch could have supported her expert opinion with references to general medical principles, as the expert did in *Coombs*, or she could have cited to a medical study, journal article or expertise. Dr. Baruch does none of this. Rather, she states that patients exposed to elevated levels of ozone may experience a variety of symptoms and that individuals with a history of asthma are more susceptible to those symptoms but does not indicate the scientific basis for that statement.

Also absent from these two statements is any explanation of the evidence that forms the basis for her opinion. While Dr. Baruch references the concentration of ozone that Mortensen was *prescribed*, Dr. Baruch does not reference any evidence concerning how much ozone Mortensen *inhaled*. There is no evidence that Mortensen inhaled the ozone gas directly from the insufflation bag. Rather, Mortensen testified at her deposition that after releasing the ozone gas into her vaginal canal, the ozone leaked into the air in the bedroom where she administered the gas and she could smell it in the air. Mortensen inhaled the ozone gas from the ambient air in the bedroom. Although Dr. Baruch states that the FDA website indicates that a device that generates ozone should not cause an accumulation of ozone in excess of 0.05 ppm by volume of air, she does not cite any evidence indicating that concentration of the ozone gas that Mortensen inhaled, including evidence that the inhaled gas exceeded 0.05 ppm.

Dr. Baruch also fails to support her expert opinion by eliminating other potential causes of Mortensen's injuries. In *Nield v. Pocatello Health Services, Inc.*, this Court recognized the use of the process of "differential diagnosis" to determine the reliability and admissibility of an expert opinion on the issue of proximate cause in a negligence action. 156 Idaho 802, 827–28, 332 P.3d 714, 739–40 (2014). The first step in differential diagnosis is to compile a list of possible causes. "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)). The next step is to eliminate hypotheses

"on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in [a] particular case." *Id.* at 828, 332 P.3d at 740. A district court is justified in excluding an expert opinion if the expert fails to offer an explanation for why the alternative causes were ruled out. *Id.* (citing *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003)). Dr. Baruch failed to take either of these steps, and therefore failed to establish a foundation for her expert opinion through differential diagnosis.

Dr. Baruch's two statements in paragraphs 11 and 19 lack sufficient evidentiary or scientific foundation to demonstrate the validity of her reasoning and conclusion on the issue of causation. Dr. Baruch's failure to cite any evidence establishing the concentration of the ozone gas that Mortensen inhaled, along with her failure to explain the scientific basis for her conclusion that Mortensen's symptoms were caused by the ozone therapy renders Dr. Baruch's opinion on causation speculative and conclusory and therefore inadmissible. The third statement contained in paragraph 17 of Dr. Baruch's declaration is based entirely on temporal proximity, and similarly lacks any scientific or evidentiary support for her opinion that Mortensen's symptoms resulted from the ozone therapy.

Unlike the majority, I believe that the facts of this case are quite similar to those in *Swallow*. Dr. Baruch appears to rely primarily on information from the FDA's website and temporal proximity to conclude that Mortensen's symptoms must have resulted from the ozone therapy. In *Swallow*, the expert relied on the lack of other risk factors and temporal proximity to conclude that the ingestion of Cipro must have caused the plaintiff's heart attack. In both cases the expert failed to explain the scientific basis and reasoning for the expert's opinion on causation. I would affirm the district court's decision that Dr. Baruch's expert opinion concerning causation lacked sufficient foundation and was therefore speculative, conclusory and inadmissible.

Justice BRODY CONCURS